In the

# United States Court of Appeals
### For the Seventh Circuit

———————

No. 06-2466

DOUGLAS M. JENNINGS,

*Plaintiff-Appellant*,

*v.*

AUTO METER PRODUCTS, INC.,
GAUGE WORKS, LLC, AND GREGORY DAY,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 04-CV-1862—**William T. Lawrence**, *Magistrate Judge.*

———————

ARGUED NOVEMBER 27, 2006—DECIDED JULY 25, 2007

———————

Before WOOD, EVANS, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* Plaintiff Douglas M. Jennings designed an aftermarket dashboard bezel—that is, a molded shape that fits over an automobile's instrument panel. Hoping to make money from his design through manufacturing and selling his bezels in the auto parts aftermarket and to forestall copycats, Jennings applied to the U.S. Patent and Trademark Office ("PTO") for a patent. As part of her review of Jennings's application, the patent Examiner contacted defendants Auto Meter Products, Inc. ("Auto Meter"), Gauge Works, LLC ("Gauge Works"), and Gregory Day to inquire whether the bezel they were selling was on sale or publicly available be-

fore Jennings applied for his patent. Jennings believes that the defendants, in response to the Examiner's inquiries, fraudulently misled her into believing that Jennings was not in fact the inventor of the bezel.

In addition to continuing to pursue his patent application, Jennings filed this action against the defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a)-(d), as well as its Indiana counterpart, Ind. Code §§ 35-45-6-2. RICO fit the bill, in Jennings's opinion, because the defendants were engaged in "the type of unfair competition that one would expect from a Mafia family or narcotics cartel." His complaint alleged that the defendants had commandeered the PTO through a pattern of racketeering activity by flooding it (via mail and wire transmissions) with false information in order to deny Jennings a patent and thereby "exploit the market for the bezel without compensating Jennings for use of his invention." In addition to his federal and state RICO theories, Jennings asserted various grounds for recovery under Indiana state law, such as unauthorized control of his property, conversion, and fraud.

The defendants moved to dismiss on various grounds. They argued that the RICO counts failed to state a claim upon which relief could be granted, see FED. R. CIV. P. 12(b)(6), because Jennings had not adequately alleged a pattern of racketeering activity. They also maintained that the state-law claims were unripe, because Jennings's patent application was still pending before the Board of Patent Appeals and Interferences ("BPAI") at the time. Defendants also moved to disqualify Jennings's attorney, claiming that he was a necessary fact witness under Indiana Rule of Professional Conduct 3.7. A magistrate judge granted the defendants' Rule 12(b)(6) motion, stayed the state-law claims, and granted the motion to disqualify Jennings's attorney. After a joint motion by the parties, the court issued a final judgment dismissing all

claims. For the following reasons, we affirm the dismissal of all claims. Because we have resolved Jennings's appeal this way, we have no need to reach the attorney-disqualification issue.

**I**

Briefly, a dashboard bezel is the structure that surrounds the instrument gauges on a car's dashboard and holds the gauges in place. Jennings's bezel replaces a car's original dashboard bezel. More than that, it improves the bezel, because it has room for more automotive gauges than were included in the original design of the car and it still allows the driver to see the entire panel of instruments. In early 2000, Jennings advertised and sold his product on the Internet at www.clubsi.com. He alleges that sometime in January 2000—about nine months before he applied for his patent—Day, the president and sole owner of Gauge Works, noticed the bezel for the first time on www.clubsi.com and decided to manufacture and sell a nearly identical one of his own. Day and his company partnered with Auto Meter, a wholesaler of aftermarket auto parts, to distribute an aftermarket dashboard bezel that Jennings claims was simply a replica of his bezel. Auto Meter, Day and Gauge Works first displayed their bezel at a trade show known as the SEMA International Auto Salon, which was held at the end of March 2000 in Pomona, California. Seven months later, on October 25, 2000, Jennings filed an application for a utility patent on his bezel.

According to Jennings, the defendants then began engaging in a series of fraudulent acts aimed at "corrupting" his patent application and sabotaging his ability to establish himself as the inventor of his aftermarket dashboard bezel. In the course of reviewing Jennings's patent application, the patent Examiner contacted Auto Meter requesting evidence that the aftermarket dash-

board bezel was on sale or publicly available before October 25, 2000. Auto Meter referred the Examiner to Day, who told the Examiner on October 21, 2002, that he, not Jennings, was the inventor of the bezel that was the subject of Jennings's patent application. Because Jennings believes that Day was lying, and the conversation occurred on the telephone, Jennings asserts that the communication was an act of wire fraud. Jennings also claims that Day subsequently contacted Auto Meter, and the two parties conspired to fabricate a product flyer purportedly for the 2000 SEMA show, to demonstrate that the bezel was indeed publicly available before the date on which Jennings filed his application. (The date of first public use matters, as inventors have only one year after that date in which to file a patent application. See 35 U.S.C. § 102(b).) The allegedly fraudulent flyer identified Auto Meter's bezel and displayed a date of October 24, 2000. On October 31, 2002, Auto Meter faxed the contested document to the Examiner. Jennings asserts that this too was an act of wire fraud. The Examiner relied on the product flyer in concluding that the aftermarket dashboard bezel was "prior art" under 35 U.S.C. § 102(a), and on that ground she rejected Jennings's patent claims in an Office Action issued on November 13, 2002.

In response to the Office Action, Jennings furnished the Patent Office with evidence that he had invented his bezel before January 2000. Following up on this information, the Examiner again contacted Auto Meter seeking additional evidence that its bezel was publicly available before June 1999. Auto Meter in turn contacted Day and Gauge Works and relayed to them its recent conversation with the Examiner. Jennings claims that the group of defendants then agreed to fabricate a second false product flyer, which showed that Day's bezel was in fact available to the public prior to June 1999, even though they knew that it was not until at least early 2000 that they first

began manufacturing the bezel. The second flyer was mailed to the PTO sometime between April 15, 2003, and August 13, 2003, another purported act of mail fraud. The Examiner issued a second non-final Office Action, mailed on August 13, 2003, once again rejecting Jennings's patent claims, this time relying on the later-filed flyer, which established (fraudulently according to Jennings) that Day's bezel was available in June 1999.

On September 11, 2003, Jennings's attorney, Paul Maginot, attempted to convince the examiner in an interview that she had relied on false information in rejecting Jennings's claims. The Examiner was not persuaded; she issued a final Office Action on February 9, 2004, rejecting Jennings's application and again referring to Auto Meter's second product flyer as her basis for concluding that the product was previously available to the public. Jennings appealed the ruling to the BPAI. Since this case was argued, the court has been informed that the BPAI has reversed the Examiner's decision, finding both substantive and procedural problems with the flyer submitted by Auto Meter. We are not aware, however, of any further developments in the PTO, and in particular, the record does not reflect that Jennings's application has either been granted or denied. (Nor has Jennings withdrawn his appeal, even though it appears that the procedures that the PTO furnishes for contesting adverse decisions may be working perfectly well for him.) Nothing that has happened renders the present case moot, however, and so we proceed with our decision.

In an effort, Jennings says, "to address the delay in the examination and issuance of his patent," he filed a request for voluntary publication of his patent application in order to obtain provisional rights in his application under 35 U.S.C. § 154(d). While the request was ultimately accepted by the PTO, the wheels did not turn quickly enough to satisfy Jennings. He claims that a number of companies

nonetheless "declined the invitation to consider a reasonable royalty for Jennings's intellectual property because the claims of the Bezel Patent Application currently stand rejected in the PTO."

After filing his request for voluntary publication, Jennings, through his lawyer, sent a letter to Gauge Works expressing his doubts about the product flyer that Gauge Works had submitted to the Examiner showing that the bezel was available before June 1999. Gauge Works responded on September 23, 2004, with its own letter stating that it believed that the flyer, which stated that the bezel would be "Available in June" without specifying the year, was intended to indicate that the bezel would be available to the public in June 2000, contrary to the Examiner's interpretation that the flyer showed the bezel would become available in June 1999. Additionally, to bolster its contention that Jennings did not himself invent the bezel, Gauge Works included with its letter a discussion about and photographs of a bezel manufactured by Mitsubishi and made available in the spring of 1999, which Gauge Works claimed constituted prior art to Jennings's bezel. Jennings counters that Mitsubishi's bezel is substantially different from his bezel, that it therefore does not constitute prior art, and that by knowingly misrepresenting it as such in its mailing, Gauge Works was perpetuating its mail-fraud schemes. Indeed, Jennings characterizes Auto Meter's letter of October 20, 2004, to him stating that Auto Meter agreed with Gauge Works's position as yet another fraudulent mailing.

While the parties quarreled over the validity of Jennings's application, Day filed his own *design* patent application regarding the same bezel in the PTO on November 1, 2002, 11 days after he had spoken with the Examiner regarding Jennings's *utility* patent application. Jennings alleges that Day and Gauge Works fraudulently conspired to name Day as the inventor in an effort to

"cover up the misrepresentations made to the Examiner during the telephone conversation of October 21, 2002." According to Jennings, the fraud continued throughout the PTO's evaluation of Day's design patent. The Examiner was never given evidence that Day had seen Jennings's bezel on the Internet in January 2000 or that the bezel was displayed at the 2000 SEMA trade show. Allegedly, the Examiner knew nothing about the product flyer that Auto Meter submitted during Jennings's patent application process. Jennings asserts that filing the design patent application without disclosing all of this relevant evidence constituted another act of mail fraud. On October 7, 2003, Day was issued a design patent on the bezel; Day's patent remains in effect.

## II

As we noted at the outset, Jennings decided to bring this suit under RICO and related theories, believing that he was one of many victims of a conspiracy by the defendants to defraud the public by manipulating PTO proceedings. The district court, however, found that Jennings had "failed to plead the requisite acts and continued criminal activity as required by RICO," and it therefore dismissed the federal and state RICO claims under FED. R. CIV. P. 12(b)(6). In the closely-related area of antitrust law, the Supreme Court recently summarized a plaintiff's pleading obligations as follows:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . . Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . .

*Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964-65 (2007). For a plaintiff seeking to pursue a claim asserting that an antitrust conspiracy existed, the Court requires "a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 1965.

Congress passed RICO in an effort to combat organized, long-term criminal activity. *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992). Although § 1964(c) provides a private civil action to recover treble damages for violations of RICO's substantive provisions, *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 481 (1985), the statute was never intended to allow plaintiffs to turn garden-variety state law fraud claims into federal RICO actions. *Midwest Grinding*, 976 F.2d at 1022. In order to establish a violation of § 1962(c), on which Jennings relies in part, a plaintiff must show the following four elements by a preponderance of the evidence: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima*, 473 U.S. at 496. A pattern of racketeering activity consists, at the very least, of two predicate acts of racketeering committed within a ten-year period. 18 U.S.C. § 1961(5); *Midwest Grinding*, 976 F.2d at 1019. In order to curb "widespread attempts to turn routine commercial disputes into civil RICO actions," *id.* at 1022, courts carefully scrutinize the pattern requirement to "forestall RICO's use against isolated or sporadic criminal activity, and to prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law." *Id.* To fulfill the pattern requirement, plaintiffs must satisfy "the so-called 'continuity plus relationship' test: the predicate acts must be related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong)." *Id.* (citing *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989)).

We can assume that the acts here are related; the question is whether Jennings can show continuity. As the Supreme Court explained in *H.J. Inc.*, the continuity requirement exists to give effect to Congress's clear intention that RICO target long-term criminal behavior, 492 U.S. at 242, as opposed to more discrete acts of fraud. Continuity can be "both a closed- and open-ended concept." *Midwest Grinding*, 976 F.2d at 1022 (quoting *H.J., Inc.*, 492 U.S. at 241). Closed-ended continuity, which is all that is even arguably present in this case, refers to criminal behavior that has come to a close but endured for such a substantial period of time "that the duration and repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future." *Midwest Grinding*, 976 F.2d at 1022-23. (An open-ended period, in contrast, is "a course of criminal activity which lacks the duration and repetition to establish continuity." *Midwest Grinding*, 976 F.2d at 1023. A RICO plaintiff may satisfy the open-ended continuity requirement by showing past conduct which "by its nature projects into the future with a threat of repetition." *Id*. (quoting *H.J. Inc.*, 492 U.S. at 242).)

In *Morgan v. Bank of Waukegan*, 804 F.2d 970, 976 (7th Cir. 1986), this court held that in determining whether there is continuity, "[r]elevant factors include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Id*. at 975. The court cautioned that "the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement." *Id*. at 976. The requirement of a pattern of racketeering activity is "a standard, not a rule, and thus its determination depends on the facts and circumstances of the particular case, with no one factor being necessarily

determinative." *Id*. We evaluate the allegations with the goal of "achieving a natural and commonsense result, consistent with Congress's concern with long-term criminal conduct*." Roger Whitmore's Auto. Servs., Inc. v. Lake County, Illinois*, 424 F.3d 659, 673 (7th Cir. 2005).

Evaluating this complaint as *Twombly* instructs and paying attention to the way in which the factual allegations correspond to the legal requirements we have outlined, we have no trouble concluding that Jennings has not presented a RICO case. Although Jennings alleges a slew of predicate racketeering acts that he claims were aimed at corrupting PTO proceedings (in his words, "an assault on the Patent Office"), at root this is a dispute over who invented an aftermarket dashboard bezel. Even if the defendants may have used misleading tactics in their various efforts to obtain the rights to the product (a point on which we take no position), the case lacks any of the hallmarks of a RICO violation. There is no pattern of fraudulent or racketeering behavior. The state courts and the PTO itself have ample tools to correct any individual instances of fraud or other misconduct.

Consideration of the *Morgan* factors shows why this is so. The duration of the alleged racketeering activity is "perhaps the most important element of RICO continuity." *Roger Whitmore's*, 424 F.3d at 673. Here, the defendants' conduct spanned an insubstantial amount of time. Their alleged fraudulent behavior began on October 21, 2002, when Day first accepted the telephone call from the Examiner. According to the complaint, the last communication with the PTO occurred as late as August 13, 2003, fewer than ten months after the alleged racketeering activity began.

Implicitly conceding that ten months is potentially too short, Jennings urges us to take a broader look at the defendants' conduct. He argues that the appropriate

time span is two years, and that we must consider two particular sets of allegations that he thinks the district court improperly ignored. First, Jennings argues that we must account for the allegations associated with Day's design patent application, which the district court held were irrelevant to the analysis. Even if we were inclined to do so, however, we do not see how it makes a difference. Day's design patent application, which Jennings argues was an act of mail fraud, was filed on November 1, 2002, 11 days after the alleged criminal activity began. While Jennings strenuously urges that Day should never have received the patent eleven months later, and he implies that the fraud was an ongoing act that continued until the application was granted, there was nothing ongoing about any fraudulent act. The alleged misrepresentation was a singular predicate act that occurred right at the beginning of the ten-month window. Second, Jennings argues that the district court should have considered the September and October 2004 letters from the defendants to Jennings as further acts of mail fraud that extended the duration of the scheme. We disagree. These were letters sent to Jennings, not the PTO, essentially explaining to him why the defendants believed that his utility patent application in the PTO should be rejected. If fraudulent at all, the letters were, in Jennings's own words, "intended to cover up the fraudulent scheme being perpetrated at the [PTO]." But actions, even if themselves illegal, taken in an effort to cover up a criminal scheme "do nothing to extend the duration of the underlying . . . scheme." *Midwest Grinding*, 976 F.2d at 1024; see also *Pyramid Sec. Ltd. v. IB Resolution Inc.*, 924 F.2d 1114, 1117 (D.C. Cir. 1991) (holding scheme to conceal underlying criminal activity by giving false deposition testimony does not extend the length of a closed-ended RICO scheme); *Aldridge v. Lily-Tulip, Inc.*, 953 F.2d 587, 593-94 (11th Cir. 1992) (noting that acts to conceal underlying wrongdoing

in a RICO suit do not carry with them the threat of future harm).

In short, Jennings's allegations, even construed generously in his favor, cannot support a time period longer than ten months. That time period, during which only a few allegedly fraudulent acts took place, is too short to show the necessary continuity for a "pattern" of racketeering. See *Midwest Grinding*, 976 F.2d at 1024 (finding a nine-month scheme insubstantial); *Olive Can Co. v. Martin*, 906 F.2d 1147, 1151 (finding six months to be a "short period of time"); *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 922 (7th Cir. 1992) (holding that a scheme that lasted at most seven to eight months was "precisely the type of short-term, closed-ended fraud that, subsequent to *H.J., Inc.*, this circuit consistently has held does not constitute a pattern."); see also *Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991) ("We hold that twelve months is not a substantial period of time."); *Primary Care Inv. v. PHP Healthcare Corp.*, 986 F.2d 1208, 1215 (8th Cir. 1993) (stating that "the activity lasted between ten and eleven months and . . . we deem this period insubstantial").

The short duration alone might be enough to dispose of this case. See *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 782 (7th Cir. 1994). The other factors identified in *Morgan* also favor dismissal, however, and so we address them briefly. Jennings has not alleged a sufficient number and variety of predicate acts to show a RICO violation. While the complaint actually alleges very few criminal acts, Jennings attempts to demonstrate a wide variety of predicate acts by alleging that individual acts violate multiple statutes. The act of mailing the purportedly false product flyer to the PTO, for example, metamorphoses in his hands into both tampering with evidence and mail fraud. What emerges from a careful

reading of his complaint is something akin to what the court found in *Vicom*, where we said, "Although Vicom's prolixity makes it seem as though Vicom alleges innumerable predicate acts to support its causes of action . . . [w]hen all the verbiage is weeded out, Vicom manages to allege a very few acts of mail or wire fraud in each count." 20 F.3d at 781. Jennings's complaint also lacks the requisite variety. Other than the evidence-tampering allegations, which, as we noted above, generally stem from acts that are also alleged to be mail or wire fraud, all we have here is a few instances of mail and wire fraud. We have repeatedly rejected RICO claims that rely so heavily on mail and wire fraud allegations to establish a pattern. See *Midwest Grinding*, 976 F.2d at 1024-25 ("[M]ail and wire fraud allegations are unique among predicate acts because the multiplicity of such acts may be no indication of the requisite continuity of the underlying fraudulent activity. Consequently, we do not look favorably on many instances of mail and wire fraud to form a pattern." (internal quotations omitted)); *Vicom*, 20 F.3d at 781 (same).

Additionally, notwithstanding Jennings's efforts to allege a vast array of victims and injuries, he is the only identifiable victim. He alleges that "the [PTO], the payers of users fees, taxpayers, and participants in the relevant automotive accessory market" are also victims of the defendants' alleged crimes, but such unspecific assertions are inadequate. In *SK Hand Tool Corp. v. Dresser Indus. Inc.*, 852 F.2d 936, 942 (7th Cir. 1988), for example, the court considered a RICO claim that the defendant "defrauded investors generally." The court rejected this claim of "fraud on the public" because the complaint "contains no well-pleaded facts permitting us to conclude that some [other] investors may have been hurt by the alleged fraud." See also *Cross v. Simons*, 729 F.Supp 588, 595 (N.D.Ill. 1989) (Williams, J.) (holding that an allegation

that victims were "U.S. Citizens" was insufficient). Jennings is the only identifiable individual who has suffered any potential injury. For similar reasons, we reject Jennings's characterization of the number of injuries suffered. He claims to have "allege[d] a myriad of distinct injuries. Among the injuries alleged are the loss of honest governmental services from officials of the [PTO], . . . the slander of Mr. Jennings's provisional patent rights and the hampering of his licensing program, . . . the loss of patent term and the corresponding loss of license fees arising from the denial of a patent to Mr. Jennings, . . . and the loss of the honest services of the defendants to perform their duty of truthfully responding to quasi-judicial officers on [sic] the U.S. Government." Each one of these so-called injuries, however, even if cognizable (which many are not), is simply a different way to characterize the damage Jennings has suffered from his inability (thus far) to get his utility patent.

Finally, Day's filing of the design patent application does not create a separate "scheme" sufficient to save Jennings's RICO claims. It is not even clear that Jennings is entitled to assert any injury from the Day design patent application, since it is unclear whether, without the utility patent Jennings is seeking, he has any legal right in any property in the first place. Regardless, the existence of a design patent application for the same product does not change what this case is really about: a dispute over various patent rights to an aftermarket dashboard bezel. As we discussed at oral argument, Jennings has a number of remedies he might pursue in order to rectify the injustice he perceives regarding these patents. But those remedies do not include a private right of action under RICO, which was never intended to apply to such brief, closed-ended, instances of fraud, where there is only one identifiable victim, and that victim suffered one articulable injury. The district court was correct to dismiss these claims.

For the same reasons, the district court properly dismissed Jennings's state RICO claim. "The Indiana RICO statute is modeled after federal RICO, and also requires proof of conduct of an enterprise through a pattern of racketeering activity. As with federal RICO, a Plaintiff must satisfy the continuity plus relationship requirement with respect to the predicate acts alleged." *Directv v. Edwards*, 293 F. Supp. 2d 873, 879 (N.D. Ind. 2003) (citing *Yoder Grain, Inc. v. Antalis*, 722 N.E.2d 840 (Ind. Ct. App. 2000)). Thus, Jennings's state RICO claims fail as well.

**III**

We turn now to the remaining state law claims. At the time this case was argued, the Examiner's decision to reject Jennings's patent application was on appeal in the BPAI. The district court, after dismissing the RICO claims, dismissed the remaining state law claims pending the BPAI's decision, finding that the case was not ripe for judicial review. Jennings contends he has suffered various harms under Indiana law whether or not he ever receives his patent, which makes it unnecessary to wait for the result of his patent application. We review the district court's decision to dismiss the complaint on ripeness grounds *de novo*, see *Metropolitan Milwaukee Ass'n of Commerce v. Milwaukee County*, 325 F.3d 879, 881 (7th Cir. 2003), and we affirm that conclusion as well.

Since oral argument, the BPAI has reversed the Examiner's decision. That does not mean, however, that the issue of Jennings's patent application has finally been resolved. As far as we are aware, the PTO has not yet conclusively determined whether Jennings will receive a utility patent on the dashboard bezel. Unless and until that happens, any damages he has are entirely speculative. Should Jennings ultimately receive his patent, any poten-

tial damages he claims to have suffered from the inability to get a patent disappear. Moreover, it remains a possibility that his application might be denied on grounds other than the existence of prior art, such as obviousness. See *KSR Internat'l Co. v. Teleflex*, 127 S.Ct. 1727, 1741-42 (2007) (invalidating a patent as obvious and rejecting, as too lenient, the approach that the Federal Circuit has been taking to that issue). We recognize that Jennings believes that he has been damaged in ways that Indiana law recognizes, whether or not he ultimately receives his patent. Nonetheless, even those claims will be affected by the outcome of the patent proceeding. The ripeness doctrine exists "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Sprint Spectrum L.P. v. City of Carmel*, 361 F.3d 998, 1002 (7th Cir. 2004) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)) (internal quotation marks omitted). Although Jennings is not asking this court to review the PTO's actions (undoubtedly because he knows that we have no jurisdiction to do so), the ultimate outcome of the agency proceedings will shed meaningful light on the nature and degree of harm Jennings may have suffered. The district court did not err by concluding it was premature to consider the state law claims.

**IV**

Finally, Jennings argues that the district court erred by disqualifying his attorney from this litigation. Jennings does not claim that he has been prejudiced thus far in any way by his attorney's disqualification, and we do not see

how he could have been. His only remedy at this point would be for us to reinstate his attorney for future litigation in this matter. Since, in the exercise of *de novo* review, we have affirmed the dismissal of all claims in this case, we need not consider whether the attorney disqualification was appropriate.

The district court's decision is AFFIRMED.

A true Copy:

       Teste:

                      _____
                      *Clerk of the United States Court of*
                      *Appeals for the Seventh Circuit*